1

**GUCOVSCHI ROZENSHTEYN, PLLC.**
Adrian Gucovschi (State Bar No. 360988)
Nathaniel Haim Sari (State Bar No. 362634)
140 Broadway, Fl. 46
New York, NY 10005
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com
         nsari@gr-firm.com

2

3

4

5

6

*Attorneys for Plaintiff*

7

8

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

9

10

11

JEREMY REICH, individually and on
behalf of all others similarly situated,

Case No.

12

13

                                        Plaintiff,

**CLASS ACTION COMPLAINT**

14

        v.

__JURY TRIAL DEMANDED__

15

16

CAMPBELL SOUP COMPANY,

17

                                        Defendant.

18

19

20

21

22

23

24

25

26

27

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Jermey Reich ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Campbell Soup Company ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on his personal knowledge.

## NATURE OF THE ACTION

1.     Plaintiff brings this class action on behalf of himself and all similarly situated consumers who purchased V8 Energy Plus Energy Drinks (collectively, the "Products").[1]

2.     Defendant markets the Products as being a "naturally flavored plant-based drink."   However, unbeknownst to reasonable consumers, the Products contain multiple of the following synthetic additives: ascorbic acid, citric acid, malic acid, sucralose, niacin, pyridoxine hydrochloride, and cyanocobalamin.  In each event, the inclusion of these synthetic ingredients renders Defendant's front-label claims that the Products are "naturally flavored" and "plant-based" false and misleading.

3.     Accordingly, Plaintiff brings claims against Defendant for violations of (1) California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq*.; (2) California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq*.; (3) Violation of California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq*.; and (4) Breach of Express Warranty.

## PARTIES

4.     Plaintiff Jeremy Reich is a citizen of California residing in Los Angeles, California.  Plaintiff purchased Defendant's "Strawberry Banana" Product for his personal use on or about April 2025 from an online retailer while residing in Los

---

[1] The Products are comprised of the following flavors: Pomegranate Blueberry, Black Cherry, Wild Berry, Strawberry Banana, Peach Mango, Orange Pineapple, Strawberry Lemonade, Strawberry Kiwi, and Lemon Lime.

Angeles, California.  Prior to making his purchase, Plaintiff saw and relied on Defendant's on-label representations that the Products were contained "Naturally Flavored" and "Plant-Based."  Plaintiff saw these representations and warranties prior to, and at the time of, his purchase.  Thus, Plaintiff reasonably relied on Defendant's representations when he decided to purchase the Products.  Accordingly, these representations and warranties were part of the basis of his bargain, in that Plaintiff would not have purchased the Products on the same terms had he known that these representations and warranties were untrue.  Furthermore, in making his purchases, Plaintiff paid a price premium due to Defendant's false and misleading claims regarding the Product's purported natural content. Plaintiff, however, did not receive the benefit of the bargain because the Products did not, in fact, contain exclusively natural flavors or plant-based ingredients, but rather contained artificial flavors and multiple synthetic ingredients.  Had Plaintiff known that Defendant's representations and warranties about the Products were false and misleading, Plaintiff would not have purchased the Products or would have paid substantially less for them.

5.    Defendant The Campbell's Company is a New Jersey Corporation with its principal place of business in New Jersey.  Defendant manufactures, markets, and sells the Products throughout California and the United States.

<u>**JURISDICTION AND VENUE**</u>

6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(a) because this is a class action where the aggregate claims of all members of the proposed Classes are in excess of $5,000,000.00 exclusive of interest and costs, and Plaintiff, as well as most members of the proposed Classes, are citizens of states different from Defendant.

7.    This Court has personal jurisdiction over Defendant because it conducts and transacts business in the State of California, including this District, thereby purposefully availing itself to the benefits of the forum.  Furthermore, a substantial

portion of the events giving rise to Plaintiff's claims occurred in this District, including Plaintiff's purchasing the Product in this District.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant conducts substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place in this District.

## **FACTUAL ALLEGATIONS**

### A.    **Consumers' Demand for Natural and Plant-Based Food**

9.    "Clean label claims resonate for purchasers of … juices and include natural, no artificial flavors, and no artificial colors."[2]  In fact, at least one survey found that "Americans are paying more attention to ingredient lists, choosing clean ingredients and avoiding chemical sounding ingredients" while "[a]bout half of Americans say they seek out natural flavors at least some of the time [and] artificial flavors, colors, sweeteners and preservatives were sought out by only about one in 10 consumers, with approximately half saying they avoid each of them at least some of the time."[3]  In fact, a 2023 study of consumer perceptions and preferences found that products "Labeled as Having No Artificial Ingredients/Colors" were the second-highest scoring indicator of food safety according to respondents.[4]

10.    In response to consumers' desire for natural products, many companies, including Defendant, have scrambled to manufacture, market, and sell purportedly "natural" and "plant-based" products in an effort to gain market share. Unfortunately, rather than creating the natural, plant-based products consumers

---

[2] Innova Market Insights, *Food Trends: US Consumer Preferences* (May 14, 2024) *available* https://www.innovamarketinsights.com/trends/food-trends/ (last accessed July 10, 2024).

[3] Food Insight, *IFIC Survey: From "Chemical-sounding" to "Clean": Consumer Perspectives on Food Ingredients* (June 17, 2021) *available* https://foodinsight.org/ific-survey-from-chemical-sounding-to-clean-consumer-perspectives-on-food-ingredients/ (last accessed July 10, 2024).

[4] International Food Information Counsel, *2023 Food and Health Survey*, (May 23, 2023) *available* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://foodinsight.org/wp-content/uploads/2023/05/IFIC-2023-Food-Health-Report.pdf at 73 (last accessed July 10, 2024).

desire, Defendant has chosen to "greenwash" the Products and market them through deceptive labeling and advertising to convince consumers the Products are plant-based and natural when, in reality, they contain synthetic and highly processed ingredients.

11.    In response to frequent and pervasive greenwashing, the United States Federal Trade Commission ("FTC") created the "Green Guides" to help companies avoid making misleading and deceptive claims. As relevant here, the FTC stated:

> Marketers, nevertheless, are responsible for substantiating consumers' reasonable understanding of "biobased," and other similar claims, such as "plant-based," in the context of their advertisements.[5]

---

[5] *See* 16 C.F.R. § 260 – Guides for the Use of Environmental Marketing Claims, p. 246, available at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf

1    12.    As depicted below, Defendant disregarded FTC guidelines on "plant-
2  based" claims, opting to manufacture the Products with ingredients that are entirely
3  artificial, synthetic, or substantially processed:



25    13.    Thus, Defendant did not fulfill its responsibility to "substantiat[e]
26  consumers' reasonable understanding of . . . 'plant-based'" advertising claims as
27  reasonable consumers, such as Plaintiff, reasonably believe that "plant-based"
28  Products only contain water or plant ingredients that have not undergone substantial

processing. Defendant's marketing and labeling practices are precisely what consumers are seeking to avoid: "natural" claims made clearly and conspicuously on the front of its labels while inconspicuously disclosing contradictory ingredient information on the other side of the packaging.

### B. The Products' Ingredients are Synthetic

#### i. *Citric Acid*

14. Citric acid "is one of the most common additives in food and beverage products across the world."[6]  Although citric acid is naturally occurring, in 2021, commercial, global production of the additive was estimated to be about 736,000 tons per year.[7]  As explained by drink brand Drink Sound, "[a] vast majority of the citric acid that [consumers] see in packaged foods … is not from citrus fruit but instead manufactured in bulk."[8]  Accordingly, "it is not the naturally occurring citric acid, but the *manufactured* citric acid [] that is used extensively as a food and beverage additive."[9]  In fact, "over 90% of the world's citric acid production is manufactured using three methods: Submerged fermentation (SF), liquid surface fermentation (LSF), and solid-state fermentation (SSF)."[10]

15. The Food and Drug Administration ("FDA") explains that the "Solvent extraction process for citric acid" is accomplished via "recovery of citric acid from

---

[6] Env't Protection Agency, *Citric Acid Supply Chain – Executive Summary*, available chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.epa.gov/system/files/documents/2023-03/Citric%20Acid%20Supply%20Chain%20Profile.pdf (last accessed July 11, 2024).

[7] Bikash Chandra Behera, et al., *Microbial Citric Acid: Production, Properties, Application, and Future Perspectives*, (Feb. 1, 2021) *available* https://onlinelibrary.wiley.com/doi/10.1002/fft2.66 (last accessed July 11, 2024).

[8] Drink Sound, *Citric Acid: Why Is It In Everything?* available https://drinksound.com/blogs/sip-on/citric-acid-why-is-it-in-everything (last accessed July 11, 2024).

[9] Illiana E. Sweis & Bryan C. Cressey, *Potential Role of the Common Food Additive Manufactured Citric Acid in Eliciting Significant Inflammatory Reactions Contributing to Serious Disease States: A Series of Four Case Reports*, 5 Toxicology Rep. (2018)  808-812, *available* doi: 10.1016/j.toxrep.2018.08.002 (last accessed July 11, 2024).

[10] Ewelina Ksiazek et al, *Citric Acid: Properties, Microbial Production, and Applications in Industries*, 29(1) Molecules (Jan. 2024) *available* doi: 10.3390/molecules29010022 (last accessed July 11, 2024).

---

conventional Aspergillus niger fermentation liquor may be safely used to produce food-grade citric acid in accordance with the following conditions: (a) The solvent used in the process consists of a mixture of n- octyl alcohol meeting the requirements of § 172.864 of this chapter, *synthetic* isoparaffinic petroleum hydrocarbons meeting the requirements of § 172.882 of this chapter, and tridodecyl amine. 12 C.F.R. § 173.280 (emphasis added). Chemical solvents such as n-octyl alcohol and synthetic isoparaffinic petroleum hydrocarbons are used to extract the citric acid that Defendant uses in the Products from *aspergillus niger* fermentation liquor. *See* 21 C.F.R § 173.280. Accordingly, the U.S. Food and Drug Administration ("U.S. F.D.A.") considers citric acid as a food additive.[11] Citric acid is commonly used as a flavor enhancer to impart tartness due to its acidic profile.[12]

ii.    *Ascorbic Acid*

16.    "Ascorbic acid is a human-made isolate used in myriad processed supplements that was created to cost-effectively mimic and replace naturally occurring vitamin C found in natural food.  It's often derived from GMO corn starch, GMO corn sugar or rice starch."[13]  For that reason, ascorbic acid is referred to as "synthetic vitamin C."[14]  Although ascorbic acid can be naturally occurring and mimics vitamin C's chemical structure, its "reactive nature makes isolation of the substance from natural sources challenging, which has resulted in all commercial

---

[11] U.S. Food & Drug Admin., *Food Additive Status List*, (last accessed July 16, 2024), *available* https://www.fda.gov/food/food-additives-petitions/food-additive-status-list.

[12] *See e.g.*, Ize ("SPARKLING WATER, APPLE JUICE CONCENTRATE, WHITE GRAPE JUICE CONCENTRATE, CLARIFIED PEACH JUICE CONCENTRATE, NATURAL FLAVOR, CITRIC ACID, GUM ARABIC, BETA CAROTENE (COLOR), RED RADISH JUICE CONCENTRATE (COLOR). ***CITRIC ACID IS ADDED FOR TASTE/TARTNESS AND IS NOT ADDED FOR PURPOSES OF PRESERVING THE BEVERAGE*.**") (emphasis added), https://www.amazon.com/IZE-Blackberry-Sparkling-Juice-Cans/dp/B0DZ6NM3VZ (last accessed September 3, 2025).

[13] Smidge Blog, *Why Real Food Vitamin C is better Than Ascorbic Acid – And How To Tell The Difference*, (June 1, 2021), *available* https://www.getsmidge.com/blogs/news/vitamin-c-versus-ascorbic-acid (last accessed July 16, 2024).

[14] Mount Sinai, *Vitamin C (Ascorbic Acid)*, available https://www.mountsinai.org/health-library/supplement/vitamin-c-ascorbic-acid (last accessed July 16, 2024).

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                        7

ascorbic acid being synthetically produced."[15]  To that end, ascorbic acid is used primarily as an antioxidant that helps prevent microbial growth and oxidation in food products.

17.    The FDA lists ascorbic acid as a chemical preservative. 21 C.F.R. § 182.3013; 21 C.F.R 170.3(e)(1).  It also considers ascorbic acid as a food additive.[16]

18.    In fact, just like Defendant's misbranded product here, in 2015, the FDA informed fruit product producer Chiquita Bananas that its Pineapple Bites and Pineapple Bites with Coconut products were "misbranding with the meaning of section 403(k) of [21 U.S.C. 343(k)] in that they contain the chemical preservatives ascorbic acid and citric acid but their labels fail[ed] to declare these preservatives with a description of their functions."[17]

19.    Importantly, Defendant acknowledges that the ascorbic acid used in the Products is not natural.[18]

###    iii.    *Malic Acid*

20.    Malic acid produced for industrial uses, such as the malic acid that is "widely used in the food industry … is generally obtained through chemical synthesis."[19] Malic acid produced for use as a food additive is called DL-Malic Acid.

---

[15] National Organic Program, *Ascorbic Acid – Technical Evaluation Report*, U.S. Dep't of Agriculture (July 17, 2019) *available* chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.ams.usda.gov/sites/default/files/media/AscorbicAcidTRFinal7172019.pdf (last accessed July 16, 2024).

[16] *Supra*, footnote 10.

[17] David Bellm, *Food Packaging: FDA Says Chiquita Labels Are Misleading*, Packing Digest (Mar. 11, 2015) *available* https://www.packagingdigest.com/trends-issues/food-packaging-fda-says-chiquita-labels-are-misleading (last accessed July 16, 2024).

[18] The Campbell Soup Company, V8 ENERGY® Ingredients - V8® Fruit and Vegetable Juices, https://www.campbells.com/v8/v8-energy-ingredients/ (last accessed September 4, 2025).

[19] POLYNT GROUP, Malic Acid for Food , available at: https://www.polynt.com/malic-acid-in-food/ (last visited August 20, 2022); James Han, What is Malic Acid in Food? Benefits, Uses, Safety, Side Effects, (Jan. 19, 2020) foodadditives.net, available at: https://foodadditives.net/acidulents/malic-acid/ ("Malic acid sold in the market usually refers to its DL form …. [DL Malic Acid] does not occur naturally and according to the FDA, it can be commercially produced by hydration of fumaric acid or maleic acid.") (last visited August 24, 2022).

DL-Malic Acid is commercially produced in a few ways, including by the hydration of fumaric acid or maleic acid[20] and by "the catalytic oxidation of benzene to maleic acid, which is converted to Malic Acid by heating steam under pressure.[21] Malic acid is considered a food additive and is listed on the FDA Food Additive Status List.[22] Additionally, malic acid is used as a flavor enhancer, flavoring agent, and adjuvant. 21 C.F.R § 184.1069.

21.    Importantly, Defendant acknowledges that the malic acid used in the Products is synthetic.[23] Defendant also admits that it uses malic acid for "tartness and flavor" in similar products listed on its website.[24]

*iv.    Sucralose*

22.    Sucralose is chemically identified as 1,6-dichloro-1,6-dideoxy-β-D-fructofuranosyl-4-chloro-4-deoxy-α-D-galactopyranoside.[25] The empirical formula of sucralose is $C_{12}H_{19}Cl_3O_8$, and it possesses three chlorine atoms covalently bound to a disaccharide core structurally related to sucrose.[26] The presence of these chlorine substituents is the result of a targeted chemical modification, distinguishing sucralose from naturally derived sugars.

23.    The FDA classifies sucralose as a "chemical" food additive. 21 C.F.R. § 172.831(a). This regulation details its chemical identity and sets purity specifications

---

[20] *Id.*

[21] Monice Zondlo Fiume, et. al., Final Report on the Safety Assessment of Malic Acid and Sodium Malate, 20 Int'l J. of Toxicology, 47, 48 (June 15, 2000), available at: https://pubmed.ncbi.nlm.nih.gov/11358110/ (last visited August 24, 2022).

[22] Substances Added to Food (formerly EAFUS), U.S. FOOD & DRUG ADMINISTRATION, https://www.fda.gov/food/food-additives-petitions/food-additive-status-list#ftnA (last visited May 8, 2025).

[23]

[24] Campbell Soup Company, *V8® Blends Ingredients - V8® Fruit and Vegetable Juices*, https://www.campbells.com/v8/v8-blends-ingredients/

[25] National Center for Biotechnology Information, *PubChem Compound Summary for CID 71485, Sucralose*, *PubChem*, available at https://pubchem.ncbi.nlm.nih.gov/compound/Sucralose (last accessed September 3, 2025).

[26] *Id.*

---

consistent with the Food Chemicals Codex instead of Generally Recognized as Safe (GRAS) status. *Id.* § 172.831(b) ("The additive meets the specifications of the Food Chemicals Codex, 7th ed. (2010), pp. 993-995, which is incorporated by reference.").

24.     Importantly, Defendant acknowledges that the sucralose used in the Products is synthetic.[27]

### v.    *Niacin*

25.     Niacin, also known as nicotinic acid or vitamin B3 ($C_6H_5NO_2$, CAS Reg. No. 59-67-6), is a white, crystalline compound chemically identified as 3-pyridinecarboxylic acid. 21 C.F.R § 184.1530. Despite being present in limited quantities in some natural food sources, the niacin incorporated into foods and energy drinks is neither plant-based nor naturally extracted, but is instead manufactured through industrial chemical synthesis. The primary commercial synthesis of niacin involves the oxidation of 3-methylpyridine (derived from petrochemical sources) to 3-cyanopyridine, which is then converted to niacin by enzymatic or catalytic processes.[28] These routes may also involve catalytic liquid-phase or gas-phase oxidations employing transitional metal catalysts under controlled conditions.[29]

26.     The manufacture of niacin consistently relies on chemical precursors and processes not found in nature. Its synthesis includes transformation steps such as selective oxidation, hydration, and cyclization reactions, all conducted outside any plant or animal system, distinguishing the resulting niacin ingredient as unequivocally synthetic and not naturally sourced7. The final product, intended for use in foodstuffs, meets the specifications set in the Food Chemicals Codex and is

---

[27]

[28] Liu, Z.; Shuai, J.; Xu, W.; Lu, X.; Xia, Q.; Zhou, D. *Catalytic synthesis of niacin from 3-methyl-pyridine and $30\%H_2O_2$ by Cu-based zeolite.* Chem. Synth. 2024, 4, 69. http://dx.doi.org/10.20517/cs.2024.19

[29] *Id.*

subject to strict quality and purity controls as established in FDA regulations. 21 CFR § 184.1530.

### vi.    *Pyridoxine hydrochloride*

27.    Pyridoxine hydrochloride ($C_8H_{11}NO_3 \cdot HCl$, CAS Reg. No. 58-56-0), the commercial form of vitamin B6, is a synthetic ingredient produced exclusively through chemical synthesis and is not naturally extracted from plant, animal, or microbial sources for use in food products.

28.    The industrial production of pyridoxine hydrochloride involves multistep organic synthesis pathways. Predominantly, the "oxazole process" is employed, commencing with chemical precursors such as L-alanine or acetylacetone, which are chemically transformed using condensation reactions, followed by Diels-Alder cyclization, acid-catalyzed rearrangement, hydrogenation, and purification by recrystallization[30]. This process results in a highly purified, stable, water-soluble powder that is devoid of the biological cofactors and matrix compounds present in food-based sources of vitamin B6.[31]

29.    The FDA specifically defines pyridoxine hydrochloride as "prepared by chemical synthesis" under 21 CFR § 184.1676(a), distinguishing it from naturally occurring vitamins found in foods such as fish, poultry, legumes, and whole grains.

### vii.    *Cyanocobalamin*

30.    Cyanocobalamin, the most frequently used form of vitamin B12 in energy drinks and dietary supplements, is a synthetic chemical compound that does not occur naturally in plants or animal tissues in significant quantities.[32] It is produced industrially by the fermentation of selected bacteria such as *Streptomyces griseus*, *Pseudomonas denitrificans*, or *Propionibacterium freudenreichii*, followed

---

[30] Itov, Z.I., Gunar, V.I. *Methods of synthesis and technology of production of drugs synthesis of pyridoxine (review)*. Pharm Chem J 22, 151–157 (1988). https://doi.org/10.1007/BF00758446

[31] Chemicalbook, *Pyridoxine hydrochloride*, https://www.chemicalbook.com/ChemicalProductProperty_EN_CB8853882.htm

[32] https://www.b12-vitamin.com/cyanocobalamin/

by chemical conversion processes wherein the microbial fermentation product (cobalamin) is specifically reacted with cyanide ions to yield cyanocobalamin—a stable, crystalline synthetic form optimized for food and pharmaceutical use.[33] The final manufacturing steps require the addition of cyanide to achieve the desired stability, resulting in an ingredient that does not exist anywhere in nature and is wholly a product of deliberate industrial chemical processing.

31.    The FDA regulates cyanocobalamin under 21 CFR § 184.1945, where it is identified as produced "commercially from cultures of Streptomyces griseus," and recognized only in its synthetic, cyanide-ligated form as a food additive.

A.    **Defendant's Products are Artificially Flavored**

32.    The Food and Drug Administration ("FDA") defines an artificial flavor as "any substance, the function of which is to impart flavor, which is not derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or similar plant material, meat, fish, poultry, eggs, dairy products, or fermentation products thereof." 21 CFR § 101.22(a)(1). The Products' use of malic acid, citric acid, and ascorbic acid meets the definition of an artificial flavor because their function is to impart flavor in the Products, and they are not derived from a natural source like a spice, fruit, or vegetable. As a result of these artificial flavoring ingredients, Defendant's "Naturally Flavored" labeling statement is false and misleading.

33.    FDA regulations recognize that malic acid is used as an artificial "flavoring agent" in food and beverage products. 21 CFR § 184.106(c). The Flavoring Extract Manufacturer's Association also recognizes that malic acid is a

---

[33] Biology Notes Online, Vitamin B12 Production (May 19, 2024), https://biologynotesonline.com/vitamin-b12-production/

flavoring ingredient.[34] Indeed, the "main use" of acidulants like malic acid "is to provide and enhance flavor of foods and beverages."[35]

34.    Malic acid has a distinct flavor profile and it provides a sour taste when added to food and beverage products.[36] This flavor profile has been described as "mellow, smooth, persistent sourness reminiscent of fruit."[37] For this reason, malic acid is often used in beverage products to simulate the flavor of apple juice as well as other fruit juices.[38] Acidulants like citric acid, malic acid, and tartaric acid "are responsible for the authentic taste and flavor" of certain fruits.[39]

35.    Malic acid and citric acid function as flavoring ingredients in the Products regardless of whether Defendant intended them to do so. This is because malic acid and citric acid impart a flavor that is reminiscent of fruit when used in the Products. Defendant's products, which depict ripe, fresh fruit on the labels, utilize malic acid and citric acid to impart the flavor that would otherwise be found in those fruits.

36.    The artificial malic acid and citric acid in the Products are a "Flavoring agent" because it is added to the Products "to impart or help impart a taste or aroma in food." 21 C.F.R. § 170.3(0)(12). Under the FDA,  if a food "contains any artificial

[34] Richard L. Hall, et al., *Progress in the Consideration of Flavoring Ingredients Under the Food Additives Amendments*, J. OF THE INST. OF FOOD TECHNOLOGIES, available at https://www.femaflavor.org/sites/default/files/3.%20GRAS%20Substances%282 001-3124%29_0.pdf

[35] E. Ramos Da Conceicao Neta et al., *The Chemistry and Physiology of Sour Taste—A Review, J. OF FOOD SCIENCE* (Mar. 12, 2007), available at https://ift.onlinelibrary.wiley.com/doi/full/10.1111/j.1750-3841.2007.00282.x

[36] P. Hartwig, et al., *Flavor Characteristics of Lactic, Malic, Citric, and Acetic Acids at Various pH Levels*, J. OF FOOD SCIENCE (March 1995), abstract available at https://ift.onlinelibrary.wiley.com/doi/abs/10.1111/j.1365-2621.1995.tb05678.x

[37] *Self-Teaching Guide for Food Acidulants*, BARTEK.

[38] M.Y. CoSeteng, *Influence of Titratable Acidity and pH on Intensity of Sourness of Citric, Malic, Tartaric, Lactic and Acetic Acids Solutions and on the Overall Acceptability of Imitation Apple Juice*, CANADIAN INST. OF FOOD SCI. AND TECH. J. (Feb. 1989), abstract available at https://www.sciencedirect.com/science/article/abs/pii/S031554638970300X

[39] *Acidulants- Technical Bulletin*, BRENNTAG FOODS, available at https://www.brenntag.com/media/documents/denmark/technical_bulletin_acidula nts.pdf

flavor which simulates, resembles or reinforces the characterizing flavor, the name of the food on the principal display panel or panels of the label shall be accompanied by the common or usual name(s) of the characterizing flavor, in letters not less than one-half the height of the letters used in the name of the food and the name of the characterizing flavor shall be accompanied by the word(s) 'artificial' or 'artificially flavored', in letters not less than one-half the height of the letters in the name of the characterizing flavor, e.g., 'artificial vanilla', 'artificially flavored strawberry', or 'grape artificially flavored'." 21 CFR § 101.22(i)(1)(iii).

37.     The characterizing flavor of the Products is fruits that contain acidic profiles. As such, citric acid and malic acid are used in the Products to simulate, resemble and reinforce those characterizing flavors. Accordingly, the Products are required to be labeled as "Artificially Flavored." Defendant omits this legally required disclosure and instead falsely labels the Products as containing "Naturally Flavored."

C.     **Defendant's Representations and Warranties**

   i.     *Defendant's Products mislead Plaintiff and reasonable consumers*

38.     Unfortunately for consumers like Plaintiff, despite the prominent "Naturally Flavored" and "Plant-Based Energy Drink" representations on front labels of the Products, the backs of the packaging, in small print, reveal the presence of artificial ingredients.

39.     By labeling the Products as being Naturally Flavored" and "Plant-Based Energy Drink," Defendant deliberately misled Plaintiff and other reasonable consumers into believing that the Products (a) were flavored from natural ingredients and (b) the other ingredients contained in the Products came from plants.  As discussed above, however, both of those representations are false because the Products contain synthetic flavoring agents and other synthetic ingredients.

   ii.     *Defendant's "Naturally Flavored" claims mislead consumers*

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    14

40.     Consumers are accustomed to seeing front-of-package claims like 'Natural and Artificial Flavors' or 'Artificially Flavored' when artificial flavor agents are added to a product, and they expect disclosure in the absence of real source ingredients. Indeed, "[a]bout half (48%) of Americans say they seek out natural flavors at least some of the time[.]"[40]

41.     Numerous market research studies demonstrate that disclosure of artificial flavors is an industry standard that consumers rely on to make informed choices about product qualities and healthfulness. As summarized in a recent peer-reviewed article:

> Recent surveys show that 62% of consumers avoid artificial flavors. Indeed, retailers have successfully been able to charge more for products labeled as not containing any artificial flavors because of consumers' belief that these foods are healthier. Hoping to capitalize on this, major food producers have promised to eliminate artificial flavors from their foods, including General Mills, Kellogg's, and Nestlé. Natural flavors now rank as the fourth most common food ingredient in processed food products. Only salt, water, and sugar are more frequently included.[41]

42.     Both the inclusion of the "naturally flavored" representation as well as the failure to include a truthful 'artificially flavored' statement violates reasonable consumer expectations and deceive consumers who specifically seek to avoid artificial ingredients.

> ### iii.     *The Context of the transaction reinforces Defendant's deceptive conduct*

---

I.  [40] International Food Information Council,   *Consumers Show Strong Interest in Knowing About Food Ingredients: "Clean" Is in, "Chemical-Sounding" Is Out* (June 17, 2021), https://ific.org/media/strong-interest-in-knowing-about-food-ingredients/

[41] Benavides, Nena. *What's in a Flavor? A Proposal to Address Consumer Confusion Surrounding Natural Flavoring.* Food and Drug Law Journal, vol. 77, no. 4, 2022, pp. 377–98. JSTOR, https://www.jstor.org/stable/27211729. Accessed 5 Sept. 2025.

43.     Consumers do not look at products in a vacuum. Instead, how they perceive a product's labels depends on the nature of the product that they are buying in comparison to other competing products. Here, Defendant markets its Products as a "natural" and "plant-based" alternative to other energy drinks. When a consumer sees that an energy drink, like the Products, is labeled as a "Plant-Based Energy Drink," they make the reasonable assumption that the Products will not contain the same type of synthetic ingredients found in ordinary energy drinks.

44.     Furthermore, because other "natural" competing energy drinks do not contain the myriad of synthetic ingredients found in the Products, consumers would have no reason to suspect that Defendant's representations were not in fact true. Below is a mere sampling of Defendant's competitors, which are wholly natural:




iii.     *The Products' Ingredient List Does Not Cure Defendant's Misrepresentations*

45.     Reasonable consumers have no reason to look at the back label of the Products when presented with the conspicuous representations that the Products are

"Naturally Flavored" and comprise "Plant-Based" ingredients. In fact, studies show that only 7.7% to 11.6% of people look at a consumer product's side or back labels before making a purchase.[42]

46.    Even if consumers had a reason to look at the back label to understand the unambiguous "natural" and "plant-based" representations, the Products' ingredient list would not suffice to dispel any potential that confusion. Reasonable consumers do not walk around with knowledge of the chemical composition of ascorbic acid, citric acid, malic acid, sucralose, niacin, pyridoxine hydrochloride, and cyanocobalamin in their heads. Thus, they would not know the true amount of natural or plant-based ingredients in the Products simply by looking at the Products' ingredient list. That discovery requires investigation well beyond what is advertised and knowledge of food chemistry beyond that of the average consumer.

**D.    Defendant's Conduct Violates California's Food Labeling Laws**

---

[42] Klaus G. Grunert et. al, *Nutrition Knowledge, and Use and Understanding of Nutrition Information on Food Labels Among Consumers in the UK*, 55 APPETITE 177, 179–181 (May 2010), https://pubmed.ncbi.nlm.nih.gov/20546813/ (consumer purchasing behavior study using in store observation and interview data collection methodology to realistically estimate the degree consumers use nutritional information (found on side/back panels of food product labels and packaging), finding: (1) only 11.6% of respondents, who looked at a product and placed it in their shopping cart, were actually observed looking at the side/back panels of its packaging or labels (panels other than the front panel) before placing it in the cart; (2) of those who looked at the side/back panels, only 31.8% looked at it the product "in detail" (i.e., 3.7% of respondents who looked at the product, looked at side/back panels in detail); and (3) the respondents self-reported frequency of reviewing side/back panels (for nutritional information) is overreported by 50% when the in-store interview data and observational data are compared). *See also* Klaus G. Grunert et. al, *Use and Understanding of Nutrition Information on Food Labels in Six European Countries*, 18 J. PUB. HEALTH 261, 261, 263, 266 (Jan. 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2967247/ (consumer purchasing behavior study using in-store observation and interview data collection methodology to evaluate whether people look at food labels before buying them, where they looked, and how long they looked, finding: (1) respondents spent, on average, approximately 35 seconds, per product, on products they bought; and (2) 62.6% of respondents looked at the front packaging, and only 7.7% looked elsewhere (side/back panels) on the packaging, for products they bought. *See also* Yael Benn et al., *What Information do Consumers Consider, and How Do They Look for It, When Shopping for Groceries Online?*, 89 APPETITE 265, 265, 270 (June 2015), https://doi.org/10.1016/j.appet.2015.01.025 (consumer purchasing behavior study using online eye-movement tracking and recordation, finding: (1) once on the product webpages, respondents tend to look at the pictures of products, rather than examine detailed product information; and (2) by comparison to pictures of products where 13.83% to 19.07% of respondents fixated far less fixated on subsidiary information: 4.17% of respondents looked at nutrition information, 3.30% looked at ingredients, 2.97% examined allergy information, and 0.09% examined recycling information).

---

47.     Defendant's marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*), including but not limited to:

a. Section 110660 (a food is misbranded if its label is false or misleading in any particular);

b. Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

b. Section 110705 (a food is misbranded if words, statements and other information required by the Sherman Law to appear on food labeling are either missing or not sufficiently conspicuous);

c. Section 110760 (making it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded);

d. Section 110765 (making it unlawful for any person to misbrand any food); and

e. Section 110770 (making it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food).

48.     Defendant's marketing, advertising, and sale of the Products also violates the false advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et. seq.*), including, but not limited to:

a. Section 110390 (making it unlawful to disseminate false or misleading food advertisements that include statements on products and product packaging or labeling or any other medium used to directly or indirectly induce the purchase of a food product;);

b. Section 110395 (making it unlawful to manufacture, sell, deliver, hold or offer to sell any falsely or misleadingly advertised food); and

c. Sections 110398 and 110400 (making it unlawful to advertise misbranded food or to deliver or proffer for delivery any food that has been falsely or misleadingly advertised).

E.    **Rule 9(b) Allegations**

49.    Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Though Defendant is best situated to know the composition of its Products, to the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

(a)    **WHO:** Defendant

(b)    **WHAT:** Defendant's conduct here was, and continues to be, deceptive because it omitted and concealed that the Products contain artificial flavors and other synthetic ingredients, despite affirmatively representing that the Products are "Naturally Flavored" and that they are a "Plant-Based Energy Beverage." These false and misleading representations were material to Plaintiff and the Classes because they would not have paid the same amount for the Products or would not have purchased the Products at all had they known the Products contained these synthetic artificial flavors and food additives. Defendant knew or should have known that this information is material to reasonable consumers, including Plaintiff and Class Members, in making their purchasing decisions, given its expertise and offering of products, as described above, yet it continued to pervasively market the Products in this manner in California and the United States.

(c)    **WHEN**: Defendant made material misrepresentations and omissions to Plaintiff and the members of the Classes during the putative class period, including prior to and at the time of purchase, despite its knowledge that the Products were not, in fact, comprised of "natural flavors" or "plant-based" ingredients. Plaintiff and Class Members viewed the packaging of the Products when purchasing and viewing the representations and warranties made by Defendant and

understood them to mean that the Products did not contain any artificial flavor or synthetic ingredients.

(d)     **WHERE:** Defendant made material misrepresentations and omissions on the Products' labels and packaging and marketing materials.

(e)     **HOW:** Defendant made material misrepresentations and omissions of fact regarding the Product by representing and warranting that the Product were comprised of "natural flavors" and "plant-based" ingredients. Defendant, on its labeling misrepresented (by commission and omission) the true contents of the Products.

(f)     **INJURY:** Plaintiff and members of the Classes purchased, and paid a premium (up to the full purchase price), or otherwise paid more for the Products than they would have, or alternatively they would not have purchased the Products at all, absent Defendant's misrepresentations and omissions.

<u>CLASS ALLEGATIONS</u>

50.     Plaintiff brings this action on behalf of himself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3) defined as ("collectively, the "Classes"):

> **Nationwide Class:** All persons in the United States who, during the maximum period of time permitted by law, purchased Defendant's Products primarily for consumption. (the "Class").

> **California Subclass:** All persons in California who, during the maximum period of time permitted by the law, purchased Defendant's Products primarily for consumption (the "California Subclass")

51.     The Classes do not include (1) Defendant, its officers, and/or directors; (2) the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's staff and family; and (4) Plaintiff's counsel and Defendant's counsel.

52.     Plaintiff reserves the right to amend the above class definitions and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

53.     **Community of Interest:**  There is a well-defined community of interest among members of the Classes, and the disposition of the claims of these members of the Classes in a single action will provide substantial benefits to all parties and to the Court.

54.     **Numerosity:**  While the exact number of members of the Classes is unknown to Plaintiff at this time, and can only be determined by appropriate discovery, upon information and belief, members of the Classes number in the millions.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

55.     **Existence and Predominance of Common Questions of Law and Fact:** Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individuals of the Classes.  These common legal and factual questions include, but are not limited to:

(a) Whether Defendant's Products were "Naturally Flavored" or "Plant-Based";

(b) Whether reasonable consumers would understand Defendant's representations and warranties concerning its ingredients to be untrue and misleading;

(c) Whether Defendant's representations and warranties were material;

(d) Whether Defendant was unjustly enriched as a result of its unlawful conduct alleged in this Complaint.

56.     With respect to the California Subclass, additional questions of law and fact common to the members include whether Defendant violated California's Consumers Legal Remedies Act, ("CLRA"), Cal. Civ. Code §§ 1750, *et seq*., California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*, and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq*.

57.     ***Typicality:***  The claims of the named Plaintiff are typical of the claims of other members of the Classes in that the named Plaintiff was exposed to Defendant's false and misleading advertising about the Product's naturalness, purchased the deceptive Products in reliance on those representations and warranties, and suffered a loss as a result of those purchases.

58.     ***Adequacy:***  Plaintiff will fairly and adequately represent and protect the interests of the Classes as required by Fed. R. Civ. P. 23(a)(4).  Plaintiff is an adequate representative of the Classes because he has no interests adverse to the interest of the members of the Classes.  Plaintiff is committed to the vigorous prosecution of this action, and, to that end, has retained skilled and experienced counsel.

59.     ***Superiority:***  A class action is superior to all other available methods for the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because the expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek redress their claims other than through the procedure of a class action.  In addition, even if Class Members could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system, resulting in multiple trials of the same factual issues.  By contrast, the maintenance of this action as a

class action, with respect to some or all of the issues presented herein, presented fewer management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes. Plaintiff anticipates no difficulty in the management of this action as a class action. Class-wide relief is essential to compel compliance with California's consumer protection laws. If separate actions were brought by individual members of the Classes, Defendant could be subject to inconsistent obligations.

## CAUSES OF ACTION

### COUNT I
**Violation of California's Consumer's Legal Remedies Act ("CLRA"),
Cal. Civ. Code § 1750, *et seq*.
(On Behalf of Plaintiff and the California Subclass)**

60. Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

61. Civil Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or he does not have.

62. Civil Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

63. Civil Code § 1770(a)(9) prohibits "advertising goods or services with intent not to sell them as advertised."

64. Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers by advertising that the Products are "Naturally Flavored" and "Plant-Based" even though they contain artificial flavors and synthetic ingredients.

65.     Defendant's wrongful business practices constituted, and still constitute, a continuing course of conduct in violation of the CLRA.

66.     On April 22, 2025, prior to filing this action, Plaintiff sent a pre-suit notice letter pursuant to CLRA § 1782.  The letter was sent certified mail, return receipt requested, and provided notice of Defendant's violation of the CLRA and demands that Defendant correct the unlawful, unfair, false and/or deceptive practices alleged herein.  Defendant failed to remedy the issues raised in the letter.

67.     Plaintiff and the California Subclass seek actual and punitive damages, restitution, reasonable costs and attorneys' fee, and to enjoin the unlawful acts and practices described herein pursuant to Cal. Civ. Code § 1780.

### COUNT II
**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200, *et seq*.**
**(On behalf of the Plaintiff and California Subclass)**

68.     Plaintiff hereby incorporates by reference and re-alleges herein the allegations contained in all preceding paragraphs of this complaint.

69.     Plaintiff brings this claim individually and on behalf of the members of the California Subclass against Defendant.

70.     Defendant violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§17200-17210, by engaging in unfair, fraudulent, and unlawful business practices.

71.     Plaintiff has standing to pursue this claim because he suffered an injury-in-fact and lost money or property as a result of Defendant's unlawful, unfair, and fraudulent conduct.  Specifically, Plaintiff purchased the Product for his own personal use.  In so doing, Plaintiff relied upon Defendant's false representations that the Product was "naturally flavored" and comprised of plant-based" ingredients when, in reality, the Product actually contained artificial flavors and synthetic ingredients.  Plaintiff spent money in the transaction that he otherwise would not have spent had he known the truth about Defendant's advertising claims.

72.     The UCL prohibits unfair competition in the form of "any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act."  Cal. Bus. & Prof. Code § 17200.  A business act or practice is "unlawful" if it violates any established state or federal law.  A practice is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers.  The UCL allows "a person who has suffered injury in fact and has lost money or property" to prosecute a civil action for violation of the UCL.  Cal. Bus. & Prof. Code § 17204.  Such a person may bring such an action on behalf of himself or others similarly situated who are affected by the unlawful and/or unfair business practice or act.

73.     Defendant's acts, as described above, constitute unlawful, unfair, and fraudulent business practices pursuant to California Business & Professions Code §§ 17200, *et seq*.

74.     Defendant violated the UCL's proscription against engaging in **Unlawful Business Practices** through its violations of the FAL, Cal. Bus. & Prof. Code § 17500, *et seq.*; CLRA, Cal. Civ. Code § 1770*, et seq*.; and the Sherman Law, including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110660, 110665, 110705, 110760, 110765, and 110770; and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343(a), *et seq*.

75.     Defendant has also violated the UCL's proscription against engaging in **Unfair Business Practices**.  Defendant's acts, omissions, misrepresentations, practices and non-disclosures as alleged herein also constitute "unfair" business acts and practices within the meaning of Business & Professions Code § 17200, *et seq.* in that Defendant's conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous as the gravity of the conduct outweighs any alleged benefits attributable to such conduct.  There is no

utility to misrepresenting the true composition of the Products to the detriment of consumers. Furthermore, Defendant's false and misleading representations are detrimental to other energy drinks that either do not make similar claims, or if they do, they do not contradict them by adding highly processed and synthetic ingredients. As such, Defendant's misrepresentations and omissions hurt both consumers and the energy drink market as a whole.

76.    Plaintiff and the Classes suffered substantial injury by virtue of buying the Products that they would not have purchased absent Defendant's unlawful, fraudulent, and unfair marketing, advertising, packaging, and omissions about the inclusion of synthetic ingredients.

77.    The gravity of the consequences of Defendant's conduct as described above outweigh any justification, motive, or reason therefore, particularly considering the available legal alternatives which exist in the marketplace.  Such conduct is immoral, unethical, unscrupulous, offends established public policy, or is substantially injurious to Plaintiff and the other members of the Classes.

78.    Plaintiff and the Classes could not have reasonably avoided their injury or known that the Product's prominent, front-label marketing was, in fact, inaccurate and contradicted by Defendant's back-label, fine-print ingredient list. Furthermore, consumers do not possess the specialized knowledge to discern if the ingredients listed on the back panel are natural or synthetic.  As such, they could not have reasonably avoided the injury they suffered.

79.    Pursuant to California Business and Professional Code § 17203, Plaintiff and the California Subclass Members seek restitution, attorneys' fees, and all other relief that the Court deems proper.

80.    Plaintiff lacks an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiff and the California Subclass Members are inadequate because they are not equally prompt, certain, and in other ways efficient as equitable relief. Damages are not equally certain as restitution

because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money Defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles Plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as restitution because claims under the UCL entail fewer elements. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

81.    Equitable relief is also appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from her purchase of the Products are determined to be an amount less than the premium price of the Products. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.

## COUNT III
### Violation of California's False Advertising Law
### Cal. Bus. & Prof. Code § 17500
### (On Behalf of the California Subclass)

82.    Plaintiff hereby incorporates the foregoing allegations as if fully set forth herein.

83.    Plaintiff brings this claim on behalf of himself and the California Subclass against Defendant.

84.    Defendant's acts and practices, as described herein, have deceived and/or are likely to continue to deceive, members of the California Subclass and public.  As described throughout this Complaint, Defendant misrepresents that the Products are "naturally flavored" and comprised of "plant-based" ingredients when they contain artificial flavors and synthetic ingredients.

85.    By Defendant's actions, they have disseminated uniform advertising regarding the Products across California and the U.S.  The advertising was, by its very nature, unfair, deceptive, untrue, and misleading within the meaning of Cal. Bus. & Prof. Code § 17500, *et seq*.  Such advertisements were intended to, and likely did, deceive the consuming public.

86.    The above-described false, misleading, and deceptive advertising Defendant disseminated continues to have a likelihood to deceive in that Defendant affirmatively represented that the Products are "naturally flavored" and comprised of "plant-based" ingredients.

87.    In making and disseminating these statements, Defendant knew, or should have known, that its advertising was untrue and misleading in violation of California law.  Plaintiff and the members of the California Subclass based their purchasing decisions on Defendant's materially false and misleading representations and warranties about the composition of its Products.  Plaintiff and the California Subclass were injured in fact and lost money and property as a result, in an amount to be proven at trial.

88.    The misrepresentations by Defendant of the material facts described and detailed above herein constitute false and misleading advertising and, therefore, constitute a violation of Cal. Bus. & Prof. Code § 17500, *et seq*.

89.    Plaintiff and the California Subclass Members seek restitution, attorneys' fees, and all other relief that the Court deems proper.

90.    Plaintiff lacks an adequate remedy at law to address the unfair conduct at issue here. Legal remedies available to Plaintiff and the California Subclass Members are inadequate because they are not equally prompt and certain, and in other ways as efficient as equitable relief. Damages are not equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff fails to sufficiently adduce evidence to support an award of damages.

Damages and restitution are not the same amount. Unlike damages, restitution is not limited to the amount of money Defendant wrongfully acquired plus the legal rate of interest. Equitable relief, including restitution, entitles Plaintiff to recover all profits from the wrongdoing, even where the original funds taken have grown far greater than the legal rate of interest would recognize. Legal claims for damages are not equally certain as restitution because claims under the FAL entail fewer elements. In short, significant differences in proof and certainty establish that any potential legal claim cannot serve as an adequate remedy at law.

91.    Equitable relief is also appropriate because Plaintiff may lack an adequate remedy at law if, for instance, damages resulting from her purchase of the Product are determined to be an amount less than the premium price of the Product. Without compensation for the full premium price of the Product, Plaintiff would be left without the parity in purchasing power to which he is entitled.

## COUNT IV
### Breach of Express Warranty
### (On Behalf of a Nationwide Class)

92.    Plaintiff hereby incorporates the foregoing paragraphs as if fully stated herein.

93.    Plaintiff brings this claim individually and on behalf of the Nationwide Class against Defendant.

94.    Plaintiff brings this claim under the laws of the State of California.

95.    Plaintiff and the Nationwide Class Members formed a contract with Defendant at the time Plaintiff and the Nationwide Class Members purchased the Products.

96.    The terms of the contract include the promises and affirmations of fact made by Defendant on the Products' packaging that they are "naturally flavored" and comprised of "plant-based" ingredients.

97.     This labeling and advertising constitute express warranties and became part of the basis of the bargain and part of the standardized contract between Plaintiff and the Nationwide Class and Defendant.

98.     As set forth above, Defendant purports through its labeling, marketing, and packaging, to create an express warranty that the Products are "naturally flavored" and comprised of "plant-based" ingredients.  However, Defendant breached its express warranties about the Products by including artificial flavors and synthetic additives, thereby rendering the prominent "Naturally Flavored" and "Plant-Based" representations and warranties false.  Simply, the Products do not conform to Defendant's representations and warranties.

99.     Plaintiff and the Nationwide Class performed all conditions precedent to Defendant's liability under this contract when they purchased the Products.

100.    Plaintiff and the members of the Nationwide Class would not have purchased the Products had they known the true nature of the Product.

101.    As a result of Defendant's breach of express warranty, Plaintiff and each member of the Nationwide Class suffered financial damage and injury as a result and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seek judgment against Defendant as follows:

a)      For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Classes, and Plaintiff's Counsel as Class Counsel;

b)      For an order declaring that Defendant's conduct violates each of the statutes referenced herein;

c)      For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

d)   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

e)   For prejudgment interest on all amounts awarded;

f)   For an order of restitution and all other forms of equitable monetary relief;

g)   For injunctive relief as pleaded or as the Court may deem proper;

h)   For an order awarding Plaintiff and the Classes' their reasonable attorneys' fees and expenses and costs of suit.

### **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury on all claims so triable.

Dated:       September 8, 2025.        Respectfully submitted,

**GUCOVSCHI ROZENSHTEYN, PLLC.**

By:    _/s/ Adrian Gucovschi_

Adrian Gucovschi (State Bar No. 360988)
Nathaniel Haim Sari (State Bar No. 362634)
140 Broadway, Fl. 46
New York, NY 10005
Telephone: (212) 884-4230
Facsimile: (212) 884-4230
E-Mail: adrian@gr-firm.com
          nsari@gr-firm.com

*Attorneys for Plaintiff*

**CLRA Venue Declaration Pursuant to California Civil Code Section 1780(d)**

I, Adrian Gucovschi, declare as follows:

1.    I am an attorney at law licensed to practice in the State of California and a member of the bar of this Court. I am a partner at Gucovschi Rozenshteyn PLLC, counsel of record for Plaintiff Dimitra Charalampopoulou in this action. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would competently testify thereto under oath.

2.    The Complaint filed in this action is filed in the proper place for trial under Civil Code Section 1780(d) in that a substantial portion of the transaction alleged in the Complaint occurred in San Mateo, California. Plaintiff Dimitra Charalampopoulou alleges she purchased the Products in this County.

I declare under the penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct, and that this declaration was executed at Miami, Florida, this 8th day of September, 2025.


_/s/ Adrian Gucovschi_
Adrian Gucovschi